JOHN F. LESLIE et al.

*v.*

HUGH LESLIE et ux.

1. If a husband purchases land with his own money, and voluntarily pro-
·cures the title to be conveyed to his wife, the presumption is that he intended
it as a gift to her, and no trust for him will result.

2. A writing intended to operate as a will, but which fails as such by reason
of imperfect execution, cannot operate as a declaration of trust unless it con-
tains on its face a clear and distinct declaration that the title to the land has
been, as a matter of fact from the beginning, held in trust by the would-be
testator for the benefit of the devisee named.

On final hearing on pleadings and proofs.

*Mr. Gilbert Collins,* for the complainant.

*Mr. J. Flavel McGee* and *Mr. John Garrick,* for the de-
·fendants.

PITNEY, V. C.

The complainants are the surviving children of Ann Teresa Leslie, late of the county of Hudson, deceased, and the defendants are Hugh Leslie, the father of the complainants and once husband of Ann Teresa, and his present wife. The subject of the controversy is a parcel of land in Jersey City, near the station of the Pennsylvania railway, fifty feet front on the street by one hundred feet rear, comprised, in fact, of two twenty-five by one hundred feet city lots. These lots were conveyed to Ann Teresa Leslie on the 1st of May, 1875, by the Kingsland heirs, of New York city, in consideration of $6,900, and, as part consideration, the defendant Hugh and his then wife, Ann Teresa, gave back two separate mortgages, each on one of the two lots comprising the whole plot, for $2,415 each, to two different persons interested in the Kingsland estate. Those mortgages were afterwards, on the 5th and 6th of April, 1889, assigned to the executors of Jacob R. Wortendyke, deceased, and on the 27th of April and the 3d of May, respectively, separate bills for foreclosure founded upon them were filed against the defendant Leslie and wife and all the complainants, and such proceedings were had thereunder that the property was afterwards sold at sheriff's sale for the amount of the several decrees, and purchased. —one of the lots directly by the defendant Hugh Leslie and the other indirectly through a friend.

The object of the bill is to have those sales declared not binding on the complainants and to declare the title of Hugh Leslie thereunder to be no more than that of a mortgagee of the complainants' title therein, and to confine him to his estate in the premises as tenant by the curtesy of England.

Ann Teresa Leslie died in August, 1882, leaving seven children, viz., John F., William J., Jerome H. (since deceased), Mary A. (since deceased), Thomas F., Parthenia and Annie. Jerome died without heirs. Mary married and died, leaving a husband and child surviving her, and the child afterwards died. So that, but for the sheriff's sales complained of, the title to the premises would be vested in the five complainants, subject to their father's right as tenant by the curtesy of England, and

subject to the right of the surviving husband of Mary A. Leslie as tenant for life in the one-seventh share of Mary.

As to one of the sales by the sheriff, it appeared at the hearing that it had not been completed and that the premises had been ordered to be resold, so that the complainants may protect themselves therein without the aid of this court; but the circumstances attending the foreclosure and sale of that lot throw light upon the case of the foreclosure and sale of the other lot, and will be referred to as I proceed.

Upon one of the mortgages, $415 of principal appears to have been paid by Hugh Leslie, and the interest on both was paid by him up to the 1st of November, 1888. They were both held by some one or other of the trustees of the Kingsland estate, in New York city.

At that time there was a considerable sum of taxes and assessments in arrear upon the premises, and pressure was made for their payment. Some time about the 1st of January, 1889, or shortly thereafter, Hugh Leslie made an effort to raise a loan of $6,500 on the premises for the purpose of paying and discharging the two mortgages, then amounting to less than $4,500, principal and interest, and also of paying the arrears of assessments and taxes; and for that purpose, through a Mr. John Halyard, a loan and real estate broker in Jersey City, since deceased, applied to the executors of Jacob R. Wortendyke. The executors had the money to loan, were well satisfied with the security, and agreed to advance the money. But it had been represented to them that the title of the property was in Mr. Leslie, the defendant. On investigation they found that the title had been in his deceased wife, and at present was in his seven children by his first wife, four of whom were infants. To meet this difficulty, Mr. Leslie produced a paper in the nature of a testamentary disposition made by his first wife, giving all her property to him ; but it was not executed with the formalities necessary to give it testamentary force, and young Mr. Wortendyke, the solicitor and counsel of the executors, so informed Mr. Leslie. He also, in the course of his examination, discovered the existence of the two mortgages—in fact, probably

was told of them by Mr. Leslie, who seems to have been an in-telligent man,—and having the money lying idle, and, as I infer from a close examination of his evidence and that of Mr. Leslie,. having in mind that Mr. Leslie would be very glad to have those mortgages foreclosed and the title cleared and his title perfected,. as against the children of his first wife, by a sale under them,. applied to the present holders of the mortgages and took assign-ments of them, one on the 5th and the other on the 6th of April. He applied for information either to Mr. Leslie, or, as I think more likely, to Mr. Halyard, and obtained the names and ages. of Mr. Leslie's children, and their residences. He also procured from Mr. Leslie written authority from himself and two of his. three adult children to his (Leslie's) stated counsel, Messrs. Bedle, Muirheid & McGee, to enter an appearance for him in a suit for foreclosure of those mortgages. He first prepared his. bill on the mortgage upon which only $2,000 was due, and filed it on the 27th of April. Upon the mortgage on which $2,415. was due, he filed his bill on the 3d of May. He issued sub-poenas in both cases on one day, but before handing them to the sheriff, he took the authority to appear, which had been signed by two of the children and by Hugh Leslie, to Bedle, Muirheid & McGee, and they acknowledged upon its back service for those parties, viz., Hugh Leslie, John F. Leslie and his wife, and Jerome H. Leslie. That acknowledgment of service by Bedle, Muirheid & McGee is dated the 7th day of May, and. on the 10th of May the sheriff served, as he certifies, the sub-poenas, personally, on William J. Leslie and his wife, and on Mary, Thomas, Parthenia and Annie, the four infants. The deputy who served the process was not produced. William and his wife both swear that no subpoena was served upon either of them. There is some evidence tending to show that Hugh Leslie induced the deputy sheriff to leave William's subpoena at his (Hugh's) house. The service on the infants, according to. the account of it, was made in the presence of their father, and while the subpoenas were handed to them they were, in each case,. except that of Mary, the eldest of the infants, at once taken from them by their father and kept by him, and were, in fact, pro-

duced by him at the hearing.  Mr. Wortendyke, the solicitor, swears that he himself, personally, served the notices of appointment of a guardian upon the infant children at their father's house in the father's absence.  The surviving children deny ever having received any such notices.  All of these notices, as well as the copies of all the subpœnas served upon the infants except that of Mary, were found in the father's possession and produced at the hearing.

I am satisfied that the children intended to swear to the truth, and that they do, substantially, swear to the truth, but that there is some confusion in their minds between the call which they received from the deputy sheriff and that which they received from Mr. Wortendyke, the solicitor.  But the fact remains that their father told them it was a matter of no consequence; that they need pay no attention to the papers so served, and that he took charge of all of them.

The clear effect of Mr. Wortendyke's evidence is to establish the fact that the foreclosure was collusive and done to assist the father in getting title.  The father denies this.  But there is a circumstance in the case which seems to me to be conclusive against him on this point.  One of the mortgages was given to Ambrose C. Kingsland, trustee, his successors and assigns, without the use of the word "heirs."  Mr. Wortendyke, in preparing the foreclosure bill, discovered this, and alleged in the bill that it was a mistake, and that the intention was to give a mortgage in fee, and prayed that the mortgage might be reformed in that respect.  Hugh Leslie, on the trial of this cause, swore that he was aware of that defect and always meant to set it up as a defence, but through negotiations for time &c., it was omitted, and decree went against him by default.  In point of fact, an examination of the master's report, in the foreclosure suit, shows that he was sworn as a witness for the complainant, to prove the allegation of the bill in that behalf, and did prove that the intention was to give a mortgage in fee.

Decrees were made in both cases in June, 1890, but execution was delivered to the sheriff in only one.  In that case the property was brought to a sale on the 28th of August, and was sold

Leslie *v.* Leslie.

to a Mr. Steele for $1,500. The deed was made to Steele, and Steele afterwards conveyed it to the defendant Hugh. It was proved and admitted that, before the sale took place, Steele, at the request of Hugh Leslie and as a favor to him, advanced the money temporarily to the Wortendyke executors, and they assigned the decree to him, and after that he managed the sale. Afterwards Hugh Leslie repaid him his money and he conveyed the lot to Leslie. Leslie afterwards mortgaged it to a third party for $2,000. He also paid up all the arrears of taxes and assessments, and the interest and costs on the other decree. Finally, in the fall of 1893, falling in arrears on his payment of interest on the remaining decree, the complainants issued an *alias* execution, and upon that, on December 21st, 1893, the premises were struck off to Hugh Leslie for $2,727, which was the amount due with interest and sheriff's execution fees, and he paid $300 on account of his bid. This sale was confirmed on the 2d of January, 1894. He failed to pay the balance, and the matter rested, waiting his action in that behalf, until after this bill was filed, and then the complainants in that foreclosure applied for and obtained an order setting aside the decree of confirmation of the sale of December, 1893, and the premises are now subject to sale.

I am entirely satisfied that neither of these foreclosures or sales need have taken place if Hugh Leslie had paid the interest on the mortgages and kept the taxes and assessments down, and that the real object of both was to perfect the title of the premises in himself as against his children.

Hugh Leslie was in possession of these premises, which were used for a boiler factory, and always has been since they were purchased. There is no pretence that the rental value was not sufficient to keep down the interest and taxes and assessments. There has been no surrender by him to the complainants, the children of his first wife; no call upon them to take the premises and protect themselves against the interest on these mortgages and the taxes and assessments. As long as he was in possession of the premises, and until some such action was taken on his behalf, it was his duty to keep down the taxes and interest; and

Leslie *v.* Leslie.

if they had been kept down, the mortgages were so desirable an investment as that he would have had no difficulty in being protected against the effect and expense of a foreclosure.

The real defence of Hugh Leslie, and the only one seriously insisted upon, was that these premises, so far as they were paid for, were paid for by his own money; that he, with his own money, paid the difference between the amount of the mortgages and the original purchase-money, besides which, before the purchase from the heirs of Kingsland, he had invested $2,000 or $3,000 in a building on them. He claims that, under these circumstances, the testamentary disposition of his first wife, although insufficient as such, still should be held to amount to a declaration of trust.

This position is untenable. It is well settled that if a husband purchases lands with his own money, and voluntarily procures the title to be conveyed to his wife, the presumption is that he intended it as a gift to her, and no trust for him will result. *Reed* v. *Huff, 13 Stew. Eq. 229; Whitley* v. *Ogle, 2 Dick. Ch. Rep. 67.* It is equally well settled that a writing intended to operate as a will, but which fails as such by reason of imperfect execution, cannot operate as a declaration of trust. To hold otherwise would be to repeal the statute of wills. *Boyes* v. *Carritt, L. R. 26 Ch. Div. 531 (1884); Lew. Trusts (Flint ed.) *58; Perry Trusts §§ 91–94.* If the testamentary writing contains on its face a clear and distinct declaration that the title has been, in fact, all the time held in trust by the wife for the husband, then, as pointed out by Mr. Perry (at § *91*), it might be construed as a declaration of trust.

The writing produced in this case does not contain such a declaration. It does not mention any particular property, but states, in effect, that any and all property, real and personal, standing in the wife's name, was given to her by her husband, and was paid for by him with his money, and closes with this language: " In case I should die, I want my husband to be sole owner of every article that I ever was and am now owner." This is an assertion of a gift, and cannot be construed as a declaration of trust.

The case cannot be brought within the authorities cited by counsel for defendant. In *Gogherty* v. *Bennett, 10 Stew. Eq. 87,* the conveyance was made to the wife without the knowledge or consent of the husband. *Irick* v. *Clement, 4 Dick. Ch. Rep. 590,* is only partially reported. There was no proof in the case which would warrant the inference that the wife, whose money in part paid for the property, was at all responsible for the vesting of the title in her husband's name, or that she ever intended to give it to him. The children, whose money made up the balance of the purchase-money, were infants at the time of the transaction.

The defendant's case therefore fails, and his title must be declared to be that of a mortgagee to secure whatever of principal-money he may have paid on account of the two purchase-money mortgages; and also, as I now think, for any assessments for benefits to the property which he may have paid, but not for any interest thereon which may have accumulated before payment. If the amount due upon the mortgage upon which sale has not been had exceeds the original principal-money, such excess must be charged against payments on account of principal upon the other mortgage.

To prevent misapprehension, I think it worth while to remark that the testamentary paper was proven wholly by the evidence of Hugh Leslie. No objection to this evidence was made on the ground that complainants were suing in a representative capacity.